[Cite as *Tobin v. Univ. Hospital E.*, 2015-Ohio-5553.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JAMES TOBIN, Admr.

      Plaintiff

      v.

UNIVERSITY HOSPITAL EAST

      Defendant

Case No. 2012-08494

Judge John P. Bessey

DECISION

{¶1} This action involves Plaintiff's claim for damages incurred by the alleged wrongful death of Bruce Tobin (Mr. Tobin) as a result of the care he received from the medical staff of The Ohio State University Hospital East (the Hospital) beginning on November 14, 2005, and concluding on November 19, 2005, when his death was officially noted. During this period, Mr. Tobin received care from actual or ostensible employees or agents of the Hospital. The matter *sub judice* exclusively involves the care and treatment provided by a single person, Wendy Morton (Nurse Morton), a nurse employed by the Hospital. The case proceeded to trial on the issues of liability and damages on October 14, 2014.

{¶2} Plaintiff, James Tobin, Administrator of the Estate of Bruce Tobin, alleges that the care by Nurse Morton negligently fell below the standard of care recognized by the medical community and caused or contributed to Mr. Tobin's death.

{¶3} Prior to Mr. Tobin's admission to the Hospital in November 2005, he had some admissions in The Ohio State University (OSU) hospital network. In 1996, Mr. Tobin received medical care at the OSU Sleep Medicine Clinic for a sleep related problem. He was diagnosed with a severe case of obstructive sleep apnea and was prescribed the use of a Continuous Positive Airway Pressure machine (CPAP).

Pursuant to the recommendation, he acquired a CPAP and used it on every occasion when going to sleep. He fully understood that the machine was intended to maintain his open respiratory airway. He also understood that a closure of the airway could cause his death.

{¶4} In September 2004, Mr. Tobin was admitted to the Harding Hospital (Harding), a psychiatric hospital at OSU's Medical Center. He was diagnosed with a bipolar disorder and placed on psychotropic medications. While at Harding, medical staff noted that Mr. Tobin was "a questionable historian" and that he was "unable to answer assessment questions appropriately." (Joint Exhibit 8-7.) After being discharged, Mr. Tobin returned to the care of his own psychiatrist and continued under her care until the time of his death.

{¶5} The records for his visit to the sleep clinic and Harding were not available to the Hospital at the time of his admission in November 2005. During that time, the OSU medical facilities were in the process of converting their medical records to an electronic system, and the sleep clinic's records had not been converted to the electronic system. While Harding's records were maintained electronically, psychiatric records could not have been released without the approval of both the patient and the chief medical officer of Harding pursuant to R.C. 5122.31.

{¶6} On November 14, 2005, Mr. Tobin presented to the Hospital's Emergency Department (ER) seeking aid for a complaint of pain in the right flank area which he felt was being caused by a kidney stone. In his initial conversation with the attending physician, Dr. Richard Limperos, he stated that he was feeling better, that his pain level was at a 1-2 and that he did not think any further testing was needed. He was diagnosed with a kidney stone and instructed to return immediately to the ER if he experienced any worsening pain, nausea, or fever. The discharge time was 11:55 PM.

{¶7} In the mid-afternoon of November 15, 2005, Mr. Tobin began to experience a return of pain. Eventually, at the behest of his wife, she transported him back to the ER. When he presented to the ER on the 15th, Mr. Tobin was asked to complete a patient database form that sought information regarding his medical history. However, because of the severe pain he was experiencing, he was not able to complete the form. Later on that evening, Mr. Tobin and his wife had a conversation on the phone during which his wife reminded him of his need for a CPAP and he assured her by saying,

"This is a hospital. They will have one." The record shows no indication that Mr. Tobin conveyed this information to any of the Hospital's employees.

{¶8} Upon evaluation, Dr. Katherine Mitzel, his attending physician on the 15th, determined that it would be necessary to admit Mr. Tobin to the Hospital. To process his admission, he came under the care of Dr. Rohit Kashyap, a hospitalist, who was responsible for preparing a history and orders for treatment that would govern Mr. Tobin's initial stay in the Hospital. To do this, Dr. Kashyap would have been expected to do a physical exam, review the medical history and treatment of the patient while he was in the ER, add to that history as he determined to be appropriate, conduct additional tests that had not been necessary for Mr. Tobin's involvement with the ER, and interview Mr. Tobin.

{¶9} At some time between 12:11 AM and 3:00 AM on November 16, 2005, Mr. Tobin entered the process of patient transfers from one department to another. The Court notes that no evidence was presented that would indicate Nurse Morton had any responsibility in facilitating the transfer of Mr. Tobin from the ER to her nursing station located on the 5th floor of the Hospital. There is also no indication that he received any treatment for his condition during that time, including pain relief.

{¶10} When Mr. Tobin arrived on the 5th floor, he came under the direct care of Nurse Morton. She received the orders from Dr. Kashyap, which included instructions that Mr. Tobin's vital signs be checked every four hours and that he remain in bed. Dr. Kashyap's orders also authorized the use of Hydromorphone (also known as Dilaudid) 2 mg IVP O2HPRN, translated as two milligrams of Dilaudid pushed intravenously no more than once every two hours. Five lines below that instruction is an instruction that states "Range: MAY BE GIVEN 1. mg TO 2. mg" which translates to a dosage of no less than 1 mg and no more than 2 mg. Nurse Morton was also permitted to administer a low dosage of Phenergan, 12.5 mg, for nausea.

{¶11} Upon his admission to the 5th floor, Nurse Morton recorded his vital signs and noted his subjective pain level was at an 8. She completed two nurse data forms totaling four pages of what, for the most part, consisted of "yes" or "no" type questions that could be answered with a check mark, performed a head-to-toe assessment, and entered the information in the patient flow sheet. She reviewed with him the room procedures for summoning the nurse and using the bed control and lights. She also gave him a patient database form to complete, which sought information regarding

insurance coverage and his prior medical conditions and treatment. Because of his pain level, he was able to complete only a few lines, specifically, his wife's name and cellphone number, that he was in the hospital for abdominal and back pain, and had a prior "illness" of hand surgery in 1978. He made no mention of his condition of acute sleep apnea.

{¶12} As his nurse, Nurse Morton's initial responsibility was to familiarize herself with a history of her patient that was sufficient to enable her to follow the orders of Dr. Kashyap. Only under specific circumstances would it have been appropriate for her to challenge or deviate from those orders. No such circumstance existed. Nurse Morton further testified that she knew that she had 24 hours to complete the form. She took into account and prioritized his attendant problems and attitude, and concluded that Mr. Tobin had demonstrated that he was in too much pain to provide the information required to complete the patient database form. Furthermore, she had the ability to access the information gathered by Drs. Mitzel and Kashyap, if necessary. Therefore, she elected to postpone the completion of Mr. Tobin's history to a more opportune time.

{¶13} At approximately 3:00 AM, Nurse Morton's assessment of her patient included the facts that he had been in the hospital for approximately eleven hours and had just been placed in a room under her supervision. He had been experiencing extreme pain which had remained unabated for an extended period of time, and was tired and highly frustrated. Her immediate objectives were to reduce his pain and his frustrations as quickly as possible and make him as comfortable as possible in order to be able to undergo further examination and treatment, which may have included an operation.

{¶14} Thirty minutes later, and consistent with Dr. Kashyap's orders, she gave Mr. Tobin a 2 mg intravenous injection of Dilaudid. In determining the amount of the dosage, she was aware that the records indicated that while in the ER, Mr. Tobin had received intravenous injections of 4 mg of morphine at 5:20 PM, 4 mg of morphine at 9:40 PM, 4 mg of morphine at 11:20 PM, and at 12:10 AM on November 16, 2005, 1 mg of Dilaudid. She observed no adverse reaction to those injections. She also understood that if an administration of 1 mg again proved to be ineffective, a fact that could take up to 30 minutes to be determined, she would be precluded from providing her patient any additional relief for over an hour. With knowledge of the short period of

relief provided by the previous administration of 1 mg, she administered a 2 mg injection.

{¶15} She did another assessment at approximately 4:15 AM and Mr. Tobin told her that his pain had decreased and, with a pain assessment of 5, was "tolerable." Her next visit was at 5:00 AM and he complained of being nauseous so, consistent with Dr. Kashyap's orders, she gave him a 12.5 mg dose of Phenergan. This was considered to be a small dosage of that medication. She also assisted him in repositioning himself in his bed. Although not noted in her progress notes, her patient flow sheet indicates that his pain level was at a 3 at approximately 5:30 AM, an indication of improvement over the prior report made at 4:15 AM.

{¶16} When she returned at 6:10 AM, Mr. Tobin noted his pain assessment had risen to 5 and stated that it was not as bad as when she assessed him at 3:00 AM. However, he was now experiencing deterioration of the control of his pain less than three hours after having received the injection of the first 2 mg of Dilaudid. She was concerned that the pain was again beginning to get ahead of the pain medication. In her initial assessment of the patient, Nurse Morton had noted that he appeared to be uncomfortable, guarded, and occasionally mildly short of breath. These are symptoms that are consistent with a person that is experiencing significant pain. Those symptoms were no longer present following the initial injection of Dilaudid.

{¶17} In addition, during all four of her assessments of him over a three hour period of time, she noted on the sedation scale that he was alert, responsive, and coherent. There was nothing about his physical appearance that was atypical. Her observations and conversations with Mr. Tobin gave her no reason to believe that another injection would cause him to experience any deleterious reaction. Nor did she detect any symptoms that would justify the need to conduct any intrusive testing. With those facts in mind and given the restraints placed on the dosage and frequency of the intravenous injections of Dilaudid, she felt that it was appropriate to administer, at the earliest possible time, an injection of 2 mg while that option was available to her. At approximately 6:10 AM, she gave Mr. Tobin another intravenous injection of 2 mg of Dilaudid.

{¶18} At 6:45 AM, Nurse Morton returned to monitor Mr. Tobin. He stated that his pain level was a 1. He was lying in bed neither expressing nor showing any discomfort. That was the last time she saw him alive. Again, the Court notes that

during the entire time of their nurse/patient relationship, which lasted for approximately four hours and forty-five minutes, she never heard him use the words CPAP or sleep apnea. The testimony and exhibits adduced during the trial of this case establish unequivocally that she also never read those words in any of the material that was provided to her regarding her duty to care for Mr. Tobin. Furthermore, she never heard the words in any conversation she had that was related to her care of Mr. Tobin.

{¶19} The general standard of review in a medical malpractice case is found in *Bruni v. Tatsumi,* 46 Ohio St.2d 127, 346 N.E.2d 673(1976), wherein the Court states:

> i. [I]n order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things.

{¶20} This statement of the law applies equally to claims that a nurse negligently caused injury to a patient. *Ramage v. Central Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 592 N.E.2d 828 (1992). "Because nurses are persons of superior knowledge and skill, they must employ that degree of care and skill that a nurse practitioner of ordinary care, skill and diligence should employ in like circumstances. Whether a nurse has satisfied or breached the duties of care owed to the patient is determined by the applicable standard of conduct. The standard of conduct applicable to this issue is proved by expert testimony." *Berdyck v. Shinde*, 66 Ohio St.3d 573, 580, 613 N.E.2d 1014 (1993), at syllabus 3.

{¶21} Plaintiff asserts Nurse Morton breached the standard of care of Mr. Tobin because she:

> 1. Failed to accurately interpret the physician's order for administration of Dilaudid;
> 2. Failed to obtain Mr. Tobin's medical history;

3.        Administered Dilaudid to Mr. Tobin when he was not in severe pain; and

4.        Failed to adequately monitor Mr. Tobin after administrating Dilaudid.

{¶22} The establishment of Plaintiff's assertion of Nurse Morton's breach of her duty of care rested primarily on Plaintiff's expert testimony of Michelle Myers-Glower, R.N. (Nurse Glower), who testified that the omission of the 1 mg Dilaudid dosage in Nurse Morton's entry was improper. The evidence indicates that she correctly downloaded the instruction but subsequently omitted the 1 mg option. The Court finds that the absence of the lower dosage option in her written orders is immaterial. Prior to Mr. Tobin's death, no one but Nurse Morton was responsible for following Dr. Kashyap's orders and she was aware of the 1 mg option. The inclusion of the 1 mg option in the orders she transcribed would not have caused her to administer the lower dosage.

{¶23} Nurse Glower was also critical of the timing and effort of Nurse Morton in completing the patient database form. (Joint Exhibit 8-4, at 20–25.) A review of that document justifies the view that its completion could be deferred but still accomplished within the required period of time. In fact, Nurse Glower had no issue with the Hospital's policy of allowing up to 24 hours to complete the document. As previously stated, the clinical records from Mr. Tobin's sleep study and psychiatric admission would not have been accessible from the Hospital database. Based on the information that would typically have been collected prior to Mr. Tobin being placed under her care, Nurse Morton was entitled to assume it was not necessary for her to abandon the care of her patient in order to investigate whether or not Mr. Tobin suffered from sleep apnea. Accordingly, the Court again holds that Nurse Morton's decision to postpone its completion did not breach the duty of care she owed to Mr. Tobin.

{¶24} Nurse Glower also opined that Nurse Morton's care fell below the requisite standard of care because she failed to check, assess, monitor, and document Mr. Tobin's vital signs after she administered the injections of 2 mg dosages of Dilaudid and the minimum dosage of Phenergan. However, Nurse Glower did acknowledge that Nurse Morton's review of the information available to her combined with her assessment of and communications with Mr. Tobin were consistent with the orders issued by Dr. Kashyap. In fact, her visits exceeded Dr. Kashyap's orders.

{¶25} In response to Nurse Glower's testimony, Defendant offered expert testimony from two nurses, Jenny Beerman and Elizabeth Curtis, as well as testimony from Dr. Errol Green, all of whom directly and unequivocally refuted the opinions of Nurse Glower. As the trier of fact, it is the Court's responsibility to weigh the evidence and evaluate the credibility of witnesses. Applying the standards in evaluating the qualifications, assessments, assumptions, conclusions, and opinions of Nurse Glower, the Court finds the testimony of Defendant's expert witnesses to be more relevant, accurate and persuasive.

{¶26} Plaintiff also alleges that the administration of Dilaudid and Phenergan by Nurse Morton were excessive and either caused or contributed to Mr. Tobin's death. Plaintiff relies primarily on the testimony of Dr. Fran Gengo, a clinical pharmacologist. In essence, Plaintiff asserts that when combined, the two drugs have a synergistic effect which enhances their sedative effect and the sedative effect exacerbated Mr. Tobin's inability to breathe, which was already impaired due to his sleep apnea condition. Specifically, Dr. Gengo testified that the repetitive injections of Dilaudid combined so that Mr. Tobin's total body burden of morphine was 25 mg at the time of his death. Dr. Gengo testified that an amount of 25 mg of morphine "more likely than not" was a significant factor which contributed to Mr. Tobin's death. Dr. Gengo also espoused the concept that if assigning a numerical equivalency of one to the sedentary effectiveness of each medication, Phenergan and Dilaudid, when combined, the sedentary effectiveness would be three rather than two.

{¶27} Plaintiff's other expert on these issues was Dr. Rolf Holle, a medical doctor whose practice since 2011 has been exclusively as a sleep medicine specialist. His opinion was that to a very high degree of medical probability, at odds of 99%, the most likely cause of death was the repeated doses of narcotics combined with Phenergan. In summary, the combined testimony of the two witnesses was that Nurse Morton over-medicated Mr. Tobin with Dilaudid and Phenergan which, when combined and administered to a patient who suffered from acute sleep apnea, caused severe respiratory difficulty that was the direct and proximate cause of Mr. Tobin's death. When asked if the same would be true if the patient did not have sleep apnea, Dr. Gengo answered, "it might not have been. I really do not think I can say that."

{¶28} To counter this testimony, Defendant offered the testimony of Dr. Green. He testified that the peak effect of Dilaudid occurs 15-20 minutes following injection and

after an hour, the effects of morphine and Dilaudid begin to even out. He further testified that the first injection of Dilaudid administered at 1:00 AM would have been almost gone by the time the 6:10 AM dosage was injected and the 3:35 AM injection would have been reduced to about .7 mg. Moreover, at the time of Nurse Morton's last visit at 7:00 AM, the third dose would have started to metabolize. Dr. Green took direct exception to Dr. Gengo's opinion of the synergistic effect of Phenergan and Dilaudid on other narcotics and testified that there is no multiplier effect. Rather it is "one plus one equals two."

{¶29} Considering the testimony provided to support the alleged negligent administration of Dilaudid and Phenergan, the Court finds that the testimony of Dr. Green to be more relevant, accurate, and persuasive than Drs. Gengo and Holle. In addition, the alleged fatal effect of the Dilaudid and Phenergan as described by Drs. Gengo and Holle was not due to their dosage or administration. Rather, it was because they were administered to a patient who suffered from sleep apnea. In administering the medications, Nurse Morton had no knowledge of Mr. Tobin's sleep apnea condition, and based on the evidence, bears no responsibility for the absence of that knowledge. She was meticulously following the instructions given to her by Dr. Kashyap and was therefore adhering to the appropriate standard of care as she justifiably believed it to be. Furthermore, Mr. Tobin had numerous opportunities to mention his sleep apnea problem or his use of a CPAP but did not convey the information to Nurse Morton or any of the doctors who treated him.

{¶30} Therefore, based on the foregoing analysis, the Court finds that Plaintiff has failed to prove its claim by a preponderance of the evidence. Accordingly, judgment shall be rendered in favor of Defendant.

_____
JOHN P. BESSEY
Judge

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JAMES TOBIN, Admr.

      Plaintiff

      v.

UNIVERSITY HOSPITAL EAST

      Defendant

Case No. 2012-08494

Judge John P. Bessey

JUDGMENT ENTRY

{¶31} This case was tried to the Court on the issue of liability and damages. The Court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of Defendant. Court costs are assessed against Plaintiff. The clerk shall serve upon all parties, notice of this judgment and its date of entry upon the journal.

_____
JOHN P. BESSEY
Judge

cc:

Charles F. Johns
400 White Oaks Boulevard
Bridgeport, West Virginia 26330

Daniel R. Forsythe
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

James C. Carpenter
Lindsay M. Bouffard
Huntington Center
41 South High Street, Suite 2200
Columbus, Ohio 43215

Paul K. Reese
707 Virginia Street, East
Chase Tower - Eighth Floor
Charleston, West Virginia 25326

**Filed February 9, 2015**
**Sent To S.C. Reporter 12/31/15**